WARFIELD *v.* WARFIELD.

Opinion delivered December 19, 1910.

DIVORCE—JUSTIFICATION FOR ABANDONMENT.—A husband is not justified in abandoning his wife except for such causes as would constitute grounds for divorce.

Appeal from Lee Chancery Court; *Edward D. Robertson*, Chancellor; affirmed.

### STATEMENT BY THE COURT.

Appellee sued for divorce, alleging wilful desertion. Appellant admitted the desertion, but alleged that it was caused by the adultery of appellee. He testified as follows: "My nephew, William Warfield, told me September 14, 1908, that he saw Tom Johnson come out of my house in my absence with his hat off and when asked what he was doing, said: 'Fellow, I have been having a time,' and proceeded to tell him what he had been doing. I understood from what Lee told me that he had been having intercourse with my wife, there in my own house. Lee just simply told me that Johnson said he had been having a time. He (Johnson) did not go further to say anything else he had been doing, but simply said he had been having a time. Lee told me this in September, 1906, and I had a row with her about it, but she did not deny it. She went off and spent two or three days and came back. I was not sure at that time whether Johnson's statement was true or false. Up to that time I had had the most perfect confidence in my wife. The next time I heard anything about plaintiff having intercourse with Johnson was in December, 1908, when my other nephew told me that he walked into my dining room and caught them in the act in September, 1906. The reason given by Emmet for not telling me sooner was that I was his uncle, and he hated to tell me all that he knew. The reason he told me then was because I asked him specially about it, and he then told me all that he knew, and I then left. Tom Johnson worked for me in 1905, then left and came back. He left the 15th or 16th of September, 1906. I ordered him to leave because I thought he was having intercourse with my wife. His duties were to pump water and feed the stock, and that only at meal

time. Plaintiff did the housekeeping, cooking and washing and would help in the field. I had little property at the time we were married. I now own some property in Lee and Phillips counties, and own some property in North Helena. I left plaintiff because of what I heard about her relations with Tom Johnson."

Lee Warfield testified that he lived within twenty-five yards of the house in which William and Fannie Warfield lived. On one occasion when William Warfield was away from home witness was going up the road, and before he got to William Warfield's house he saw Tom Johnson coming out of the house, and witness asked him what he had been doing, and he said "he had had a time."

Emmet Warfield testified: "I lived about 50 yards of where William and Fannie Warfield lived. I am a nephew of appellant. It was in the fall of 1906 I saw Tom Johnson and Fannie Warfield having sexual intercourse. It was in the kitchen in William Warfield's house. It was in the afternoon in broad daylight. They were standing up face to face in the corner of the kitchen, close to a window. The window had no shade. I came up on the porch, passed into the dining-room door, and saw them having intercourse through the kitchen door. I could see them plainly. The dining-room door through which I passed was ajar; the rest of the house was closed up. The distance from the back steps to the dining-room door is about eight feet, and the dining-room is about 12 feet across. There was no carpet of any kind on any of the floors, and I wore medium heavy shoes. The building is a box house, consisting of two bed rooms, dining-room and kitchen and store room. I did not go into the house to catch any one, and did not tiptoe. I did not tell the defendant about it until about two years after I saw them together. Defendant never lived with plaintiff after I told him what I saw. I was in Starrett's camp in May, 1905. Tucker Williams was there at the same time. At that time and place and in my presence, and in the presence of Tucker Williams, Tom Johnson admitted that plaintiff was his sweetheart. In the fall of 1905 Tom Johnson again admitted to me, while on defendant's place, that plaintiff was his sweetheart, and gave him a pair of gloves.

On last Thursday, at Harris's mill, Tom Johnson admitted to me that it was true that he had had intercourse with plaintiff, but that he had already made a statement to plaintiff's lawyer, and that, if he had had any assurance that defendant would give him no trouble, before the statement was made to the attorney, he would have made a clean breast of the whole matter. I am working for defendant. I was instructed to go to Harris's mill for the purpose of finding out positively where Tom Johnson could be located when it came time to take depositions. I told him at that time that it would be proved that he was guilty of the charge. He told me that he was simply trying to clear himself by what he had told plaintiff's attorney, and that if he had known that it would not give him any trouble he would have said the truth, but as he had testified what he had he would stick to it."

Tucker Williams testified that he heard Tom Johnson in May, 1905, when he and Emmet Warfield and witness were working together in the same camp, say that he (Tom) had Fannie Warfield as his woman, and asked witness not to tell anything about it.

Tom Johnson, who was introduced as a witness by appellant, denied that he had ever even had any improper relations with Fannie Warfield, and denied that he had ever been intimate, or that he had ever had sexual intercourse, with her. He denied all the statements attributed to him by Lee and Emmet Warfield and Tucker Williams. Among other things, he testified as follows:

"Emmet Warfield came to me last Thursday at Harris's mill and asked me if I had been to any lawyer, and when I told him 'Yes' he said he would have liked to see me before I went to a lawyer. I never had any improper relations with plaintiff, and she never by word or act indicated to me that she was not a virtuous woman. She always treated her husband as a wife should; she did the cooking, washing and sometimes worked on the farm. Emmet Warfield never saw me lying on plaintiff in defendant's dining-room on September 14, 1906, and I never was in such a position. I left defendant's house about the 14th day of September, 1906. He drove me off. I denied that I was intimate with plaintiff. I never went back

to the place again. I left the place because defendant owned the place and ordered me to leave."

The testimony in behalf of appellee tended to prove that she was an industrious, affectionate and faithful wife. Appellee testified, denying any sexual intercourse with Johnson.

The decree granted a divorce to appellee and the sum of $200 attorney's fee in addition to $50 that had been previously allowed, and one-third of appellant's personal property, and one-third of his real estate for life in pursuance of section 2684, Kirby's Digest. From the decree this appeal has been duly prosecuted.

*Fink & Dinning,* for appellant.

*P. D. McCulloch,* for appellee.

WOOD, J., (after stating the facts). 1. "According to the matrimonial law of England," says Lord Penzance, "nothing will justify a man in refusing to receive his wife except the commission of some distinct matrimonial offense, such as adultery or cruelty, upon which the court could found a decree of judicial separation." *Yeatman* v. *Yeatman,* Law Rep. 1 P. & M. 489, 491; 1 Bish. Mar. Div. & Sep. § 1752. As observed by Mr. Bishop: "If this rule of decision was sound in England at a time when judicial separations were allowed only for adultery and cruelty, much more should it be received as such in this country where the causes of separation and divorce are more extended." See note to § 1752, *supra.*

If the parties to a marriage contract were allowed to renounce the ties of wedlock, and to abandon the duties and obligations of the conjugal relation for any cause that seemed reasonable and just to them, or for any cause other than the legal cause for divorce, then indeed would such contract have but little binding force and the sanctity of the marital state would be destroyed. Suits for divorce, already far too numerous, would overwhelm the courts of chancery. Hence "the interests of society, the happiness of the parties, and the welfare of families demand the rule," *supra,* that there shall be no abandonment of the matrimonial relation except for such causes as would constitute grounds for divorce. 1 Bishop, Mar. Div. & Sep. § 1753.

2. To justify appellant in his desertion of appellee, which he admits, it devolved upon him to prove that appellee had been guilty of adultery. The evidence he adduces for that purpose is entirely insufficient. Appellant admits that he had the most perfect confidence in his wife up to the time that his nephew told him that Johnson said "he had had a time with her." This information alone, it appears, caused him to think that Johnson had been having intercourse with his wife. Whereupon he ordered Johnson to leave, and had a "row with her about it." "She did not deny it," he says; "but went off and spent two or three days and came back." He "was not sure at that time whether Johnson's statement was true or false." He "was not fully satisfied of her guilt, and hence did not leave her, until December 10, 1908, when he was told, by one who says he saw her, of her having intercourse with Johnson. We quite agree with the counsel for appellee in his analysis of the testimony and his conclusion that it is wholly unworthy of belief. It is unreasonable to believe, if Johnson had really been having intercourse with appellant's wife, that he would have communicated such fact to the nephews of appellant. It is unreasonable to believe that Johnson and Mrs. Warfield were having sexual intercourse at the place, and especially in the posture, described by Emmet Warfield. If Johnson was in unholy *liason* with the wife of appellant, it was most unnatural and unnecessary, as counsel suggest, that they should have been "indulging in sexual felicities standing up in the corner of the kitchen close to the window face to face," when there were two bed rooms close at hand, and when appellant was absent at Helena, and there was nothing in the surroundings to interrupt the freedom of their illicit commerce in its most "desirable and natural way." Nor is it believable that witness Emmet Warfield could have approached, as he said he did, "walking with ordinary shoes over a wooden floor for a distance of 20 feet and not on tiptoe to catch any one," without giving warning. And, if warned, it is utterly unreasonable to believe that human beings would have continued their indulgence, like brutes, oblivious to detection. On the contrary, if appellee and Johnson could have engaged in the act in manner and form as described by the witness, then we have no doubt but that at the

sound of the first footfall they summarily would have ended the performance and escaped observation.

Our conclusion therefore of the whole matter of fact is that the testimony of these nephews of appellant is a pure fabrication. For 18 years appellee as the wife of appellant not only faithfully performed her customary household duties, but in addition worked by appellant's side in the field. By their combined industry and frugality they had amassed a small fortune. During all these years her demeanor as the consort of appellant was so exemplary that close neighbors could not detect any impropriety therein, and they unhesitatingly pronounced her a "good wife," and say that she gave appellant "no cause for treating her as he did," and that "they would have known it if she had given him such cause."

Appellant himself concedes that he had no suspicion of infidelity on her part until he received the alleged information thereof through his nephews. Appellant accepted this accusation as true, forgetting that ofttimes "virtue itself 'scapes not calumnious strokes," and immediately proceeded to "raise a row with her" whom he had plighted to love and cherish. For two years thereafter appellant continued to cohabit with appellee as his wife, and the record discovers no disloyalty on her part towards him. But, upon being told again that appellee had committed adultery two years previous, he forthwith abandons her. As we have endeavored to show, the story then told appellant was so shockingly unnatural in its details as on its face to bear the evidences of its falsehood. Appellant never even investigated to determine whether the accusation was true. His failure to do so, and his abandonment of appellee under such circumstances, was wholly unjustifiable, and therefore wilful. His conduct in so doing can only be explained upon the theory that he was so completely dominated by the "green-eyed monster" as to be incapable of exercising his reasoning faculties. To conclude that appellee was unfaithful to her marriage vow from the testimony in this record would do her a gross injustice. But, even if there were room for some doubt upon this proposition, we should still regard the judgment of the learned chancellor as strongly persuasive, and feel it our duty to affirm it.

3. The present case is that of a divorce *a vinculo matri-monii*. The marital bonds are completely severed by the decree. The husband was living when the decree was entered. Hence no question of dower intervenes here, and *Johnson* v. *Bates,* 82 Ark. 284, has no application. Appellee takes the property awarded her in pursuance of the very terms of the statute. Sec. 2684, Kirby's Digest.

The judgment is affirmed.